IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

SUSAN WALKER,                        )
                                     )
                    Plaintiff,       )        Civil Case No. 06-687-KI
                                     )
        vs.                          )        OPINION AND ORDER
                                     )
T-MOBILE USA, INC.,                  )
                                     )
                    Defendant.       )
_____         )


        William D. Stark
        876 Welcome Way, S.E., Suite 200
        Salem, Oregon  97302

                Attorney for Plaintiff

        James Severson
        Bingham McCutchen LLP
        Three Embarcadero Center
        San Francisco, California   94111


-and-

Paul Buchanan
Kurt Barker
Stoel Rives LLP
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon  97204

      Attorneys for Defendant


KING, Judge:

Plaintiff Susan Walker brings claims for violations of the Family Medical Leave Act ("FMLA"), common law wrongful discharge, and breach of the duty of good faith and fair dealing against defendant T-Mobile.  Before the court is defendant's Motion for Summary Judgment (#58).

**OBJECTIONS TO THE EVIDENCE**

Defendant submitted lengthy objections to Walker's exhibits and affidavits.  Walker, in turn, made seven objections to some of the exhibits and declarations submitted by defendant.

Taking defendant's objections first, defendant objects to the affidavits of Andrew Church and Paula Devers-Greer, affidavits filed in an earlier-decided case, <u>Sherman v. T-Mobile</u> No. CV 06-608-KI, and affidavits of Taraza Lawrence,[1] Katharine Cooper, and Walker herself. Defendant also objects to a number of exhibits, mostly on the basis of relevancy, hearsay, and abuse of the summary judgment process.  Finally, defendant objects to Walker's counsel's failure to provide any citations to the record in support of Walker's responses to defendant's concise statement of material facts ("CSMF").

---

[1]This witness is also referred to as Tara Tyler.  I will use Lawrence.

I grant defendant's objections to the Church and Devers-Greer affidavits on the basis that

Walker failed to disclose that either of them would be witnesses. At a January 18, 2007, status

conference, I directed defendant to serve supplemental interrogatories on Walker asking her to

identify potential witnesses, and noted that if Walker failed to respond she would be prohibited

from using the undisclosed witnesses. Defendant served supplemental interrogatories on Walker,

but she named neither Church nor Devers-Greer in response. In conformance with my earlier

order, I strike the Church and Devers-Greer affidavits.

Additionally, I acknowledge the trouble Walker put defendant through in submitting all

of the declarations and deposition testimony previously filed in <u>Sherman</u> without directly

referencing to it in Walker's memorandum or CSMF. Walker simply "incorporat[es] in its

entirety plaintiff's (Charles Sherman) concise statement of material facts and exhibits,

declarations and depositions[,]" refers to the "Charles Sherman documents" in her memorandum,

and to the "Sherman v. T-Mobile Decls, Depos., Exhibits" in her CSMF. Pl.'s Mem. in Res. to

D.'s Mot. for Summ. J. at 1-2, 12; CSMF ¶ 22. Although I consolidated the cases for purposes of

discovery, I specifically refrained from consolidating the cases for any other purpose.

Furthermore, Walker's reliance, in this fashion, on the evidence submitted in <u>Sherman</u> violates

Local Rule 56.1(c), which requires a party to cite to a particular affidavit, deposition, or other

document, including page and line number references, in her CSMF. Local Rule 56.1(e)

absolves me of any independent duty "to search and consider any part of the court record not

otherwise referenced in the separate concise statements of the parties." To that end, I have not

read again all of the materials I first reviewed in the context of <u>Sherman</u>. Nevertheless, I have

reviewed these materials where feasible.

I agree with defendant that Walker failed to follow Local Rule 56.1(c) in her response to defendant's CSMF. That rule makes it clear that a party must cite to affidavits, depositions, or other documents with page numbers and line numbers in support of "the party's statement, **acceptance, or denial** of the material fact." L.R. 56.1(c)(1) (emphasis added). Walker has made the jobs of opposing counsel and the court more difficult and burdensome. As a result, while I will attempt to sift through the record for support of Walker's denials this time, especially since they appear to rely most heavily on Walker's declaration dated August 7, 2007, I warn counsel that I expect all the rules of civil procedure to be followed, including the local rules, and I will not be so lenient in the future.

With regard to defendant's remaining objections, I do not rule separately on each objection. I do take note of defendant's objection that plaintiff has abused the summary judgment process in submitting evidence that is cited nowhere in her moving papers and, as I stated above, I have not read all of Walker's materials for that reason.

Finally, I accept defendant's responses to Walker's seven objections, and I overrule Walker's objections to defendant's evidence.

## BACKGROUND

I.    <u>Walker's Duties</u>

Defendant hired Walker as a customer care representative in September of 2000. Defendant promoted Walker to a supervisor/coach in October of 2001, a position requiring her to supervise approximately 15 customer care representatives. As part of her supervisor duties, she responded to representatives' questions when they raised their hands during customer calls, and dealt with "escalated calls." Walker also monitored her representatives' calls, either in a side-by-

side monitoring session, or by randomly choosing a previously recorded call, and coached them on how to provide better customer service. Supervisors/coaches were expected to give timely feedback.

Defendant expects its supervisors/coaches to conduct a set number of monitoring events and coaching sessions a month. In March 2004, defendant required supervisors/coaches to meet with each representative a total of four times to give each feedback on his or her customer service. In April 2004, defendant increased the number to eight per month for each representative.

The coaching sessions had to be recorded in a database. Walker admits that it was optimal for the supervisor to enter the data at or near the time that the session occurred. Defendant contends that it was the company's expectation that the reporting would take place as soon as possible after the coaching session.

There is some dispute between the parties about whether Walker could take a representative off the phones for mentoring sessions with one another–also called peer-to-peer coaching–without obtaining prior approval from her manager and then calling in an exception to Resource Planning. Defendant explains that representatives are expected to be on the phones, except for lunches, training, breaks, and one-on-one coaching sessions, except for valid business reasons, which is why manager approval was necessary prior to taking a representative off the phones. Walker asserts that her previous managers had given her some discretion to set up mentoring without getting prior approval. Defendant underscores that regardless of what previous supervisors may have told Walker, Ryan Gordon, Walker's manager at the time her employment was terminated, made it very clear to Walker that she was not to call in a coaching

exception to Resource Planning if the exception was for mentoring, but Walker continued to do so.

II.    Walker's Employment Under Hammons and Knight

In November 2002, Walker reported Holly Hammons, her manager at the time, for improperly sharing a password, and Hammons was disciplined for her conduct.

In April 2003, according to defendant, two representatives complained about Walker's performance and conduct. At that time, Hammons was still Walker's manager. As a result of those complaints, two representatives from Human Resources spoke with every member of Walker's team in one-on-one meetings. The General Manager met with Walker's entire team together, and he and another representative from Human Resources, subsequently issued Walker a written warning. Walker was suspended with pay pending the results of the investigation. Some of the incidents noted in the written warning included representatives' complaints that Walker retaliated against them for seeking out Hammons with questions, Walker's negative comments about her colleagues, and Walker's refusal in some instances to take escalated calls. Walker believes that the 2003 written warning was unjustified, and was motivated by a desire to retaliate against her for reporting Hammons' misconduct.

Charity Knight subsequently became Walker's supervisor. Effective March 28, 2004, Walker received a 3.5% merit increase, which appears to be based on a 2003 Performance Evaluation completed by Knight in which Walker was described as having had "good performance" in 2003. Pl.'s Ex. 10 at 1.

III.   Walker's Employment under Gordon

In March of 2004, Gordon became Walker's manager.  As the first month with her progressed, Gordon became concerned that Walker did not take accountability for her actions and did not meet deadlines.  Both Hammons and Knight had previously noted difficulties Walker experienced in organizing herself and meeting deadlines.  Walker does not agree with Gordon's opinion about the quality of her work, and refers to her 2003 Performance Evaluation.

Walker describes Gordon and Hammons as friends based on a work-related email Hammons sent to Gordon, which she signed, "Thanks friend. hh."  Pl.'s Exhibit 14.  In the email, Hammons forwarded to Gordon an email she had received from another coach about Walker's request that one of her representatives come into work on her day off.  Hammons suggested that Gordon educate Walker about the need for overtime in that instance.  Gordon describes his relationship with Hammons as "a good working relationship" with no social contact outside of work.  Gordon Dep. 90:23-91:24.

In March 2004, Gordon received three complaints about Walker not helping on the floor.  Gordon counseled Walker about not playing favorites on March 12, 2004, but later that month one of Walker's representatives complained about favoritism.  Gordon counseled Walker about both of these issues on March 26, 2004.

On March 27, 2004, Walker received an email that one of her peers had nominated her for a PEAK Achievement Award, "the highest honor a T-Mobile employee can receive."  Winners for Quarter 1 of 2004 would be announced April 30, 2004.

In March 2004, Gordon reminded Walker about entering her coaching sessions into the database, T-Metrics.  Gordon's notes reflect that he checked T-Metrics the morning of April 1

and noticed that Walker had not made any entries.  When he checked the program the morning of

April 2, Walker had entered 148 coaching sessions.  Walker remembers meeting the deadline of

April 1, but admits entering 148 coachings over the weekend.

On April 6, 2004, Walker received a written warning.  Specifically, the written warning

noted representatives' complaints about Walker's refusal to take escalated calls, Walker's delay

in documenting her coaching feedback to her representatives, her failure to organize her time,

and failure to comply with expectations about the length of the calls she monitored.

Walker asserts that she saw Gordon and Hammons discussing something for an hour and

a half just prior to receiving the April 6, 2004, written warning.  She does not know what they

were discussing.

IV.    Walker's Injury

On April 8, 2004, Walker injured her ankle at work.  The next day, Walker asked Lisa

Dean, Human Resources Generalist, about intermittent leave "in case I needed it."  Walker Dep.

16:6-7.  Dean told her that because Walker was a salaried supervisor, she didn't know how that

would work, and she would get back to Walker.

On April 14, 2004, Walker saw a Kaiser Permanente nurse practitioner for the injury.

The nurse practitioner recommended in a letter that Walker stay off her foot for five days.  There

is no evidence that plaintiff ever gave the letter to anyone at T-Mobile.

On April 15, 2004, Walker alerted defendant that she had injured her ankle and needed to

stay off her foot for five days.  Dean called defendant's workers' compensation carrier to file the

claim, and discussed providing modified work to Walker.

On April 16, 2004, Dean faxed a modified job offer letter to Walker's doctor. According to Dean's notes, it was at this point that Walker's medical provider realized that Walker considered her ankle injury to be covered by workers' compensation, and so it called Walker back in to see a doctor. Pl.'s Ex. 17 at 2.

On April 18, 2004, defendant received a fax from a doctor who had examined Walker, approving modified work, which required minimal standing, minimal walking and sitting duties only, through April 30, 2004. Walker was later approved for continued modified work through May 21, 2004.

Walker returned to work on April 19, 2004. She had been out four of the five days initially recommended by the nurse practitioner. Defendant provided Walker with a wheelchair upon her return to work.

Dean informed Walker that she could ask the representatives to come to her desk for coaching, but Gordon told her she could not. Walker had trouble with the wheelchair because it hurt her shoulder to use it. Walker never complained to defendant that use of the wheelchair hurt her shoulder.

Walker followed up with Human Resources asking for information about intermittent leave on two subsequent occasions, but never received any answers to her inquiries. Walker never made a specific request for time off, other than the initial time off when she first injured her ankle.

Gordon received complaints in April 2004 that Walker was not assisting with escalated calls, and that she was complaining about her written warning. Walker responds, "My team and I performed satisfactorily during April. This is yet another example of Gordon looking for

anything that could be used to justify my termination. I was working despite my physical limitations and work restrictions." Walker Decl. ¶ 30. Walker also claims her team won an incentive award in April 2004. Defendant disputes the date of the $100 incentive award.

V.   Walker's Harassment Complaint

On April 19, 2004, Walker's friend Jeannie Hubbard told a Human Resources employee that Walker had said she was feeling harassed. Hubbard may have specified the harassment was due to religion. Walker did not ask Hubbard to speak to Human Resources.

On April 21, 2004, Dean met with Walker to ask her about Hubbard's report, with Gordon acting as a witness. Walker explained that she believed Hammons had retaliated against her for reporting Hammons' password sharing misconduct. Walker did not discuss religious harassment during this meeting. Walker remembers telling Dean that she did not want Gordon present because he had not been involved in Hammons' misconduct and she wanted her discussion about Hammons to remain confidential. Dean told her Gordon was Walker's manager and needed to remain in the room. Dean told her the meeting was confidential, but Walker admits she discussed the interview with Hubbard.

On April 26, 2004, Dean met with Hubbard again, and during that meeting Dean's notes reflect that Hubbard stated, "I think that Susan is going after Holly with a complaint that all the women she harasses are Christian. . . . Susan and I are also Christians. I think that Susan believes Holly is out to get us because of that and that is what she told her lawyer." Dean Decl., Ex. C at 2. Hubbard informed Dean that Walker would report her concerns to corporate management.

On April 28, 2004, Dean and Gordon had a follow-up meeting with Walker to ask her about whether she felt harassed because of her religion. Walker reported to Dean and Gordon that, "There is a common thread among the women who were harassed –Jeannie, Tara and Kathy are all Christians and so am I." Dean Decl., Ex D. Later in the interview, Dean specifically asked Walker, "So you are telling me that there was no harassment based upon your Christianity religion" and Walker replied, "Yes, that is right. But there is a common thread." Dean, in an attempt to clarify, said, "I still don't understand how this common thread is an issue. You have not shared with me any comments or actions on Holly's part that discussed anything about religion." Walker responded, "There were several of us that are Christian–there is a common thread. That is all I have to say." Dean Decl., ¶ 5, Ex. D.

Walker agrees that Dean's notes accurately reflect the general content of the interview except "what I was trying to make clear was that ever since I had gone to Jason Freilinger [Hammons' supervisor] about the situation with Holly, forward, I had felt ongoing retaliation and harassment and religious discrimination. It was all the way from being with Holly forward." Walker Dep. 168:24-169:4. Walker also asserts that the notes do not reflect that she was feeling the same kind of harassment from Gordon. Walker admits she did not tell Dean or Gordon that she felt Gordon was harassing her because Walker is a Christian.

Dean did not question Gordon or Hammons as part of the investigation.

VI.    Walker's Termination

In April 2004, Walker entered the majority of her quality monitors in the computer on the last day of the deadline. The last two could not be entered because the program failed at midnight. Other supervisors were having the same problem using the program.

On April 30, Gordon met with Walker. He told her that she could not have multiple representatives off the phones at the same time unless she obtained his approval first, and he reminded her that she could not call in a coaching exception to Resource Planning if the exception was for mentoring. Walker disputes that she did not have discretion to call in coaching exceptions, relying on an April 23, 2004, email which she contends contained a policy giving her that discretion. The policy reads, "Coaches and Senior Reps may approve System exceptions in any flag condition and ad hoc Coaching in Blue or Green flag." Pl.'s Ex. 35. All other exceptions must be approved by a manager, who are identified by name in the policy. Mentoring exceptions do not qualify as system issues or coaching.

On May 4, 2004, Walker met with Gordon and Freilinger, Gordon's supervisor, and Dean. They informed her that she was on a final warning due to poor performance, reiterating that she could not pull multiple representatives off the phones at once for mentoring and call it in as a coaching exception.

On May 6 and 10, 2004, Walker had multiple representatives off the phones at the same time and the exceptions were called in as coaching. Gordon believed that Walker was dishonestly attempting to boost her coaching numbers by logging simultaneous coachings since she had been called out for not providing timely coaching to her representatives. Gordon Decl. ¶ 10, Ex. B, Walker Dep. 186:19-22, 190:23-191:7. Walker denies this, relying on Exhibit 35 as evidence that what she was doing was not against defendant's policy.

After the May 4 final warning, Hubbard complained that Walker was bothering her for information about what she had told Dean and Gordon during the investigation. Walker testified that she did speak with Hubbard, but that "she [Hubbard] told me she had never spoken to HR,

so I felt they weren't investigating her, and it wasn't a problem, she was my closest friend." Walker Dep. 193:3-8.

Defendant terminated Walker's employment on May 13, 2004. The reasons listed in the Request for Termination prepared by Gordon included Hubbard's complaint about Walker's discussion of the investigation, Walker calling in multiple coachings at one time, problems with time management, wrongly implying that Gordon approved a promotion for one of Walker's representatives, and not meeting quality and adjustment accuracy goals in April. Walker did not see the Request for Termination until long after her termination.

Walker testified that she "cleared off her desk" after her employment was terminated. Walker Dep. 104:16-17. August-Sanchez testifies in her declaration "in situations where we have determined that an employee has taken confidential information from the Call Center, we have terminated that individual's employment." August-Sanchez Decl. ¶ 5.

Walker claims that defendant gave bonuses to managers that were tied in part to the absence rate of employees for whom the manager was responsible, despite the fact that some absences were statutorily protected. Walker also asserts that supervisors/coaches were given different guidance about how to treat their representatives' requests for family leave, and different guidance about whether to document the reason for the absences. Finally, Walker contends that Human Resources failed to inform her and other supervisors that intermittent leave was available to them. Defendant denies that there was ever a plan to reduce absences due to family leave, or to discourage employees from taking family leave.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

Walker alleges claims under the Family Medical Leave Act, common law wrongful discharge, and breach of the duty of good faith and fair dealing.

I.     FMLA Claim

In her Complaint, Walker alleges that T-Mobile:

> [I]nterfered with and harmed plaintiff's employment because plaintiff had attempted to use and/or was using leave under the FMLA, by terminating the plaintiff on May 13, 2004.
>
> A substantial factor in defendant T-Mobile's interference with plaintiff's employment was because she was eligible for leave under FMLA and/or asserted her rights under FMLA, contrary to FMLA statutes . . . .

Complaint, ¶¶ 17, 18.

It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1). This provision is violated "by engaging in activity that tends to chill an employee's freedom to

exercise his [] rights." <u>Bachelder v. America West Airlines, Inc.</u>, 259 F.3d 1112, 1123 (9th Cir.

2001). Examples of interference include denying leave, discouraging an employee from using

leave, and using the taking of leave as a negative factor in employment actions. <u>Xin Liu v.

Amway Corp.</u>, 347 F.3d 1125, 1133 (9th Cir. 2003). Under an interference cause of action, a

plaintiff "need only prove by a preponderance of the evidence that her taking of FMLA-protected

leave constituted a negative factor" in an employment decision. <u>Bachelder</u>, 259 F.3d at 1125.

    A.    <u>Walker's Termination for Taking and Inquiring About Leave</u>

Defendant argues there is no evidence that defendant terminated Walker's employment

because she took leave or inquired about leave. Defendant points to the following facts: Walker

had a history of performing poorly, before she injured her ankle and requested leave; Walker's

request for leave was granted; Walker interfered with an investigation; and Walker's supervisor

believed she was dishonest.

Walker asserts that she first asked about intermittent family leave on April 9, 2004, and

took time off from April 15 through April 18. After Walker returned to work, she followed up

with Human Resources on two subsequent occasions asking about intermittent leave, but never

received answers to her inquiries. Defendant terminated her employment on May 13, 2004.

Walker contends that this timing alone should defeat defendant's summary judgment motion. In

addition, she argues that her performance refutes defendant's reasons for terminating her. She

claims that both the 2003 and 2004 written warnings were retaliatory. Walker also relies on the

fact that she and other supervisors had not been given accurate information about their eligibility

for intermittent leave, and describes defendant's actions as attempts to reduce absences by

limiting employee access to information about family leave.

I first consider defendant's reason for terminating Walker, which comes down to what defendant characterizes as performance problems. Walker received a 2003 and a 2004 written warning, both of which were issued prior to Walker's ankle injury. If Walker is correct that the written warnings were issued for retaliatory reasons, they must have been issued to retaliate for reasons other than her ankle-related absences or inquiries about intermittent leave. Accordingly, I do not give credence to Walker's argument on this point.

Gordon did counsel Walker about performance-related issues after the injury. After she returned from her absence, Gordon counseled Walker on her responsibility to take escalated calls, not to discuss her written warning with other coaches, and not to have multiple representatives off the phones at the same time without obtaining Gordon's approval. Additionally, defendant contends the final events that persuaded Gordon to recommend Walker's termination, and that he listed in the Request for Termination, included: Walker discussing the harassment investigation with Hubbard, continuing to pull representatives off the phone for peer-to-peer mentorings without obtaining Gordon's approval, waiting until the end of the month to enter her coaching feedback, implying that Gordon approved an application to promote someone, and failing in April to meet quality and adjustment accuracy goals.

As the Ninth Circuit has pointed out, "Where termination decisions rely on subjective evaluations, careful analysis of possible impermissible motivations is warranted because such evaluations are particularly 'susceptible of abuse and more likely to mask pretext.'" Liu, 347 F.3d at 1136 (quoting Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990) (internal citation omitted)).

Nevertheless, in this case, Walker opined that Gordon was micromanaging her because,

> I had gone to Jason Freilinger and complained about Holly Hammons, or taken a concern to Jason about Holly Hammons. When I had gotten through all that, HR coming to me about the religious discrimination, and knowing that I was going to go to Corporate and complain about it, because I felt that I was being moved toward firing and I felt that it was from higher up than just Ryan.

Walker Dep. 117:8-15. Unlike Liu, Walker fails to identify any comments made by Gordon or any Human Resources person, or anyone at T-Mobile for that matter, suggesting that defendant terminated Walker because of her absences or inquiries about leave. See Liu, 347 F.3d at 1137 (supervisor's behavior "suggests that the evaluation may have been tainted with his attitude towards her leave"). While Walker states she did not know who knew about her intermittent leave inquiries, she does not name Gordon as someone with whom she discussed this issue. Neither of the written warnings, nor the Request for Termination, identify absences as being a problem or a justification for the discipline.

Furthermore, there is no evidence in the record that defendant treated Walker any differently once she returned to work–Gordon counseled her on the same sorts of behavior before and after her absences. Walker herself sums up Gordon's approach toward her, which she admits was consistent throughout the time he supervised her.

> A: [H]e says [referring to Gordon's notes] I was not taking accountability for all [my] actions. He – that was his montra [sic] with me. That seemed to be the ongoing theme I got from him constantly. That was his biggest velvet hammer.
>
> Q: Did he bring up that lack of accountability from the time you started reporting to him?
>
> A: Yes, basically . . . . And that's why I felt that he was very definitely a part of this whole retaliation [for reporting Holly's password misconduct and HR questioning Walker about religious discrimination], and that's why I stated so.

Walker Dep. 134:20-135:5; 117:8-15.  Similarly, in answer to a question about whether Gordon was concerned about the number of monitors Walker had completed, Walker testified as follows:

> Q:  And do you remember him expressing some concern about the number of monitors you had done?
>
> A:  I do [remember], but, you know, that seemed to be a constant ongoing issue from Ryan.
>
> Q:  And from the start of your reporting to him as a manager?
>
> A:  Yes. . . . He was on me about everything all the time.

Walker Dep. 126:14-22.  Finally, in answer to a question about whether Gordon thought Walker was dishonest from "early on" and whether that belief "continued throughout the time" that Walker reported to Gordon, Walker answered, "Yes I do, and I feel it was fueled by Holly Hammons."  Walker Dep. 76:5-12.  It is apparent from this testimony that if Gordon gave Walker a more difficult time than he did any other supervisors/coaches, he did so from the beginning, and without regard to Walker's ankle-related absences.

In an attempt to refute defendant's characterization of her performance, Walker offers evidence of her good performance, pointing to her 2003 Performance Evaluation, her merit increase, her team's incentive award, a "month-to-date" report printed on April 27, 2004, and being nominated by a peer for the PEAK Achievement Award.  The 2003 Performance Evaluation and related merit increase were for the year 2003 but, other than the 2003 written warning, all of the documented performance problems discussed above occurred in 2004.  Walker's team purportedly received an incentive award in April of 2004, but Walker provides no evidence of the year in which it was issued.  Even if it were issued in April of 2004, it was directed only at customer response time, and defendant terminated Walker's employment for

reasons other than her team's performance on customer response time.  Walker fails to explain what the numbers in the "month-to-date" report mean and how the report demonstrates her team was performing above average.  Finally, the fact that Walker was nominated by a peer for an award is not sufficient to call into question defendant's reasons for terminating her employment.

Indeed, Walker only seriously disputes one reason in the Request for Termination prepared by Gordon.  She claims that she did not imply that Gordon approved an application to promote one of her representatives.  Even setting that reason aside, the Request for Termination offered several other non-leave related reasons supporting Walker's termination.  First, Walker admits that she discussed the harassment investigation with Hubbard, even though she did so because Hubbard had said she had not spoken to HR.  Dean's direction was clear; Walker was not to talk with anyone about the investigation.

Second, Walker continued to pull representatives off the phone for peer-to-peer mentorings without obtaining Gordon's approval.  Exhibit 35, the policy upon which Walker relies, does not support her actions because it required manager approval for all exceptions except system issues and coaching.  Walker was counseled on the need for manager approval for mentoring exceptions many times.  Furthermore, while Walker rejects the notion that she did anything wrong, she admits that Gordon concluded from the reports "that there was something funny going on with [her] coachings." Walker Dep. 186:19-23.  Indeed, in answer to a question about whether Gordon "honestly concluded, looking at the [Resource Planning] reports, that you were trying to manipulate your performance," Walker answered, "Yes.  And it's like from the beginning of going to work with him, I could never get this turned back around again."  Walker Dep. 191:2-7.

Third, Walker waited until the end of the month to enter her coaching feedback, admitting that she could not enter the last two quality monitors on the last day of the deadline because the program failed at midnight. Finally, Walker offers no evidence, other than the unexplained month-to-date report, that Gordon inaccurately reported that Walker's team did not meet the quality and adjustment accuracy goals in April.

It is true that Walker's absences for the ankle injury and inquiries about intermittent leave occurred a month before her termination. As Walker points out, "close temporal proximity between two events may give rise to an inference of causal connection." Liu, 347 F.3d at 1137 (quoting Hodgens v. General Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)). In addition, Walker offers evidence that defendant did not support employees' need for family leave. She claims that defendant gave bonuses to managers that were dependent in part upon the absence rate of employees for whom the manager was responsible, despite the fact that some absences were statutorily protected. Walker also asserts that supervisors/coaches were given different guidance about how to treat their representatives' requests for family leave, and different guidance about whether to document the reason for the absences. Finally, Walker contends that she and other supervisors were not informed that intermittent leave was available to them. In short, she contends that defendant deliberately kept leave information from its employees in order to reduce absences.

Even assuming these allegations are true, they are not sufficient to raise a material issue of fact contradicting the overwhelming and well-documented reasons supporting defendant's decision to terminate Walker's employment. Even if defendant wanted to keep absences to a minimum, and did so by keeping information about leave rights from employees, there is no

evidence that they terminated Walker in order to do so. Indeed, Walker never made a specific request for time off, other than the initial time off when she first injured her ankle, and defendant allowed her to take time off after her ankle injury.

Walker suggests that Dean arranged for a "second opinion" on Walker's need for time off, implying that Dean forced Walker to forfeit her right to the full five days. Dean did fax a modified job offer letter to Walker's doctor, but Walker admitted that she received the call from her doctor to return to the office for a second visit. Walker Dep. 22:8-10. When Walker's doctor approved her for work release, defendant provided a wheelchair to accommodate the requirement that Walker stay off her feet. Accordingly, there is no evidence in the record that Dean forced Walker to return to work, forfeiting her right to leave.

In sum, I conclude that Walker fails to raise a genuine issue of material fact that defendant considered Walker's FMLA qualified leave or her inquiries about leave as a factor in its decision to terminate her employment.

> B.      <u>Defendant's Interference with Walker's Right to Know About Intermittent Leave</u>

Walker also argues that because she was not provided with the information she requested about intermittent leave, defendant interfered with her rights under the FMLA. Walker asked about intermittent family leave on April 9, 2004, and after she returned to work she followed up with Human Resources twice but never received answers to her inquiries.

Defendant argues that the claim is only viable if Walker can demonstrate that she was prejudiced by defendant's actions. <u>See</u> <u>Stewart v. Sears, Roebuck & Co.</u>, No. CV-04-428-HU, 2005 WL 545359, * 11 (D. Or. Mar. 7, 2005) ("plaintiff must show that the alleged failure [to give notice] caused the plaintiff some prejudice"). Defendant asserts Walker was not prejudiced

by the lack of information. Defendant gave her 4 out of the 5 days she requested, and she returned to work with a doctor's release. Walker never requested any other time off. In sum, Walker cannot point to any adverse effects she suffered due to defendant's failure to provide information about leave.

Walker argues that defendant did not tell her of her right to be placed on family leave for 5 days, and defendant told her it did not know whether she was eligible because she was on salary. Walker claims she was forced to forfeit her FMLA protections because defendant did not provide her with the requisite forms and attempted to keep her from becoming eligible for leave.

The regulations implementing the FMLA require employers to provide notice to employees about their rights and obligations under the Act. 29 C.F.R. § 825.301. Most pertinent here, employers "are also expected to responsively answer questions from employees concerning their rights and responsibilities under the FMLA." Id. at § 825.301(d).

The question becomes whether Dean's failure to inform Walker of her rights and obligations in taking intermittent leave following her ankle injury caused Walker "some prejudice, 'render[ing the plaintiff] unable to exercise that right in a meaningful way, thereby causing injury." Stewart, 2005 WL 545359, * 11 (quoting Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 143 (3d Cir. 2004)).

With regard to the five days, as I indicate above, Walker stayed home four days. Her doctor recommended work release. Walker provides no evidence that Dean was involved in obtaining a different recommendation from Kaiser about Walker's ability to work. Defendant provided a wheelchair for Walker while at work, to comply with the doctor's recommendation

that Walker stay off her foot. There is no evidence that the absences counted against Walker in any way.

As for Walker's claim of interference with her right to take intermittent leave, Walker fails to raise a material issue of fact demonstrating that she was prejudiced by defendant's failure to tell her that she was entitled to intermittent leave. Walker admitted in her deposition that she never actually requested any additional time off for her ankle. While she testified that she was "trying to find a way to get intermittent leave in place so I could take some time and get the foot up and get it taken care of again," she did not take any vacation days or sick leave. Walker Dep. 214:5-7. Her doctor did not indicate a need for time off, and approved work release through May 21 noting only that she was to return to the clinic in three weeks. This is not a situation where Walker needed to preschedule time off, such as for a pregnancy or a surgery. Walker fails to raise a genuine issue of material fact demonstrating that she needed leave that she was not given. Accordingly, Walker has failed to raise a genuine issue of material fact that she was prejudiced by defendant's failure to inform her about her rights under the FMLA.

Defendant's Motion for Summary Judgment is granted against Walker's FMLA claim.

## II. Wrongful Discharge

T-Mobile asserts that it is entitled to judgment on Walker's wrongful discharge claim as well. Walker alleges two different grounds for her claim, as follows:

> Plaintiff was eligible for leave under Oregon's Family Leave Laws (OFLA).

> Plaintiff's discharge and process of discharge were wrongful and against Oregon public policy because a substantial factor in defendant's decision to terminate plaintiff was because she had invoked her rights to utilize OFLA laws.

Complaint, ¶¶ 23, 24.

> Plaintiff's discharge and process of discharge were wrongful and against Oregon public policy and plaintiff's employee rights because a substantial factor in defendant's decision to terminate plaintiff was because she had resisted religious discrimination.

Complaint, ¶ 29.

Absent a contractual, statutory, or constitutional requirement, the general rule is that an employer may discharge an employee at any time and for any reason. Babick v. Oregon Arena Corp., 333 Or. 401, 407 n.2, 40 P.3d 1059 (2002). Two exceptions exist. The first is when an employee is discharged for fulfilling an important public duty. Nees v. Hocks, 272 Or. 210, 536 P.2d 512 (1975) (employee discharged for serving on jury duty); Delaney v. Taco Time Int'l., Inc., 297 Or. 10, 681 P.2d 114 (1984) (discharged for refusing to sign a false and arguably tortious statement). The second is when the plaintiff is discharged for exercising a job-related right that reflects an important public policy. Brown v. Transcon Lines, 284 Or. 597, 588 P.2d 1087 (1978) (discharged for filing a workers' compensation claim but statutory remedy in place at the time was inadequate). The Oregon Court of Appeals has allowed a wrongful discharge claim based on retaliation for invoking OFLA rights. Yeager v. Providence Health System Oregon, 195 Or. App. 134, 142-43, 96 P.3d 862 (2004).

In a wrongful discharge claim, the employee must establish a "causal connection between a protected activity and the discharge." Estes v. Lewis and Clark College, 152 Or. App. 372, 381, 954 P.2d 792 (1998). The employee's protected activity must have been a "substantial factor" in the decision to terminate the employee. Id. In other words, the employer's wrongful purpose must have been a "'factor that made a difference' in the discharge decision." Id.

(quoting <u>Nelson v. Emerald People's Utility Dist.</u>, 116 Or. App. 366, 373, 840 P.2d 1384 (1992),

<u>aff'd in part, rev'd in part</u>, 318 Or. 99, 862 P.2d 1293 (1993)).

A.    <u>Wrongful Discharge for Invocation of OFLA Rights</u>

For the reasons state above, Walker has failed to show a causal connection between her

invocation of FMLA/OFLA protected rights and her termination.  Accordingly, this aspect of

Walker's wrongful discharge claim fails.

B.    <u>Wrongful Discharge for Religious Discrimination</u>

Walker must demonstrate that she "in good faith report[ed] a belief that she was

discriminated against in violation of Oregon's anti-discrimination laws and the employer

terminate[d] her for reporting the discrimination."  <u>Figueroa v. Paychex, Inc.</u>, No. CV-99-797-

ST, 2000 WL 1164266, * 11 (D. Or. Jun. 30, 2000), <u>citing</u> <u>McQuary v. Bel Air Convalescent</u>

<u>Home, Inc.</u>, 69 Or. App. 107, 111, 684 P.2d 21 (1984).

Defendant argues that Walker admitted to Dean and Gordon that she had no basis to

believe defendant was discriminating against her for her religion, and in her two meetings with

them she could not identify any comment or action indicating religious discrimination.  She

never complained to any supervisor or Human Resources staff about any religious

discrimination.  Rather, Gordon and Dean approached Walker because they heard from *other*

employees that Walker felt "harassed."

Additionally, defendant asserts that Walker cannot establish a causal connection between

her termination and her alleged resistance to religious discrimination.  Her two written warnings

preexisted any meetings with Dean and Gordon about her religious harassment theory.

Walker argues that defendant learned she was upset by her treatment and that she had talked to other supervisors about complaining to corporate management about religious discrimination. Walker contends that defendant knew as of April 19, 2004, that Walker was concerned about religious discrimination and that she was discussing legal action.

Walker also asserts that evidence of an inadequate investigation is circumstantial proof of wrongful motive. Walker asserts that defendant never conducted a valid investigation; rather, it was conducting a "witch hunt." For example, Lawrence would have told Dean that she felt discriminated against on the basis of religion if Dean had asked her. Dean allowed Gordon into the interviews, even though Walker had complained about Gordon. Defendant never reviewed Hammons' personnel records to determine if there had been other complaints, and it never interviewed Hammons or Gordon about Walker's reports. In sum, Walker asserts that a jury could conclude that the defendant was more interested in eliminating Walker–someone who had complained about religious discrimination–than in fully investigating the allegations and responding appropriately to Hammons.

Walker's claim must fail. First, Walker offers no evidence that she reported feeling discriminated against on the basis of her religion. Walker admits that she did not approach HR about her feelings of religious discrimination. Rather, entirely on her own initiative, Hubbard reported it to HR, and HR initiated the investigation.[2] In Walker's first interview with Dean, Walker reported feeling that Hammons had retaliated against her for reporting Hammons'

---

[2]Walker makes much of her belief that Hubbard initially reported *religious* harassment, while defendant asserts that Hubbard only reported harassment and that it learned one week later that it learned Walker was concerned about *religious* harassment. Neither defendant nor I see the significance of Walker's insistence on this point.

misconduct with the password. Walker did not mention feeling discriminated against on the basis of her religion.

At a follow up meeting, Walker said only that, "There is a common thread among the women who were harassed–Jeannie, Tara, and Kathy are all Christians and so am I." Dean Decl., Ex. D. Later in the interview, Dean specifically asked Walker, "So you are telling me that there was no harassment based upon your Christianity religion" and Walker replied, "Yes, that is right. But there is a common thread." Id. Walker, in her deposition testimony, agrees that Dean's notes generally reflect the conversation, clarifying only, "[W]hat I was trying to make clear was that ever since I had gone to Jason Freilinger [Hammons' supervisor] about the situation with Holly, forward, I had felt ongoing retaliation and harassment and religious discrimination. It was all the way from being with Holly forward." Walker Dep. 168:24-169:4.

Furthermore, Walker admitted that she never told Dean or Gordon that she felt Gordon was harassing her because she is a Christian. Indeed, in response to a question about whether anyone at T-Mobile ever said anything "bad about religious people or religions in general," Walker said, "No." Walker Dep. 71:4. In sum, Walker fails to raise a genuine issue of material fact showing that Walker reported religious discrimination and, in fact, her own testimony demonstrates that the source of any harassment was due to her report of Hammons' misconduct not her religion.

Even if Walker's statements qualified as complaints about religious discrimination, Walker cannot establish that any complaint was a "substantial factor" in the decision to terminate her. Walker received two written warnings prior to her complaint of harassment. Hammons was

not involved in the decision to terminate Walker's employment. Although Gordon was involved, Walker concedes that she never complained that Gordon was anti-Christian.

Walker insists that Gordon and Hammons were friends, and that Hammons encouraged Gordon to terminate her employment. She points to a work-related email about Walker in which Hammons signed, "Thanks friend. hh." Pl.'s Ex. 14. She contends that she saw Gordon and Hammons discussing something for an hour and a half just prior to receiving the April 6, 2004, written warning. Walker does not know what they were discussing, she does not offer any deposition testimony from Hammons (indeed there is no indication Hammons was deposed at all), or any deposition testimony from Gordon about what they were talking about.

Walker requests that I construe improper motive from what she characterizes as a botched investigation. Based on the fact that Walker never complained about religious harassment from Gordon, Dean did not err in failing to interview Gordon or in allowing Gordon in the interviews. Moreover, considering Walker's concession that there was no harassment based on Walker's religion, just that it was a "common thread," it is not surprising that Dean did not review Hammons' personnel records or interview Hammons. The fact that Lawrence would have stated she felt discriminated against for being Christian, if she had been asked, is of no moment. The investigation was intended to evaluate the reasons for *Walker*'s feelings of harassment, not Lawrence's. Thus, on this record, any causal connection between Walker's complaint of religious discrimination and her termination is based on little more than speculation.

Defendant is entitled to summary judgment on this portion of Walker's wrongful discharge claim.

III.     Good Faith and Fair Dealing

Walker alleges the following:

Defendant had express policies that provided that an employee could bring complaints of mistreatment to the attention of higher managers in the organization without retaliation. Plaintiff was aware of and accepted defendant's policies by continuing employment with defendant.

At the time the decision was made to terminate the plaintiff, defendant became aware that the plaintiff had discussed her concerns about discrimination about herself and other employees and mismanagement with other employees, expressly noting that the plaintiff was discussing taking her concerns to Sue Nokes, a company Vice President. Defendant was aware that the plaintiff had complained of Manager Holly Hammons ridiculing a gay employee and had complained that Manager Holly Hammons had been treating a number of Christian employees more harshly than other employees.

Plaintiff also notified defendant that she wanted to take intermittent family leave because of her ankle injury and defendant ignored her request and failed to follow its procedures and process a family leave request for the plaintiff.

Defendant's policies and plaintiff's agreement carries with it an implied duty of good faith and fair dealing in the performance of the agreement. Defendant violated that duty and defeated plaintiff's reasonable expectations for the performance of the agreement because defendant retaliated against the plaintiff because she had reported misconduct by Holly Hammons; failed to investigate the plaintiff's complaints about the treatment of a gay employee and failed to investigate plaintiff's mismanagement concerns, after learning of the concerns and instead terminated the plaintiff before she could communicate her concerns to the company vice-president[;] and because a substantial factor in defendant's decision to terminate the plaintiff was that plaintiff had complained of discriminatory conduct and/or that she was considering or had made a complaint to Vice President Sue Nokes or other corporate executives and/or because plaintiff had made a request for intermittent leave. Defendant also violated the duty of good faith and fair dealing by with-holding a substantial amount of plaintiff's personnel records, requiring plaintiff to file a law suit to acquire all of her records.

Complaint, ¶¶ 33- 36.

Every contract contains an implied duty of good faith. Uptown Heights Associates v.

Seafirst Corp., 320 Or. 638, 645, 891 P.2d 639 (1995). The duty is applied in a manner to

effectuate the objectively reasonable contractual expectations of the parties. The duty of good faith cannot serve to contradict express contractual terms, even for "an unpleasantly motivated act that is expressly permitted by contract." Id. (internal quotation omitted).

Although Walker's complaint alleges four violations of the duty–that Walker should be able to complain without fear of retaliation, that her complaints should be investigated, that she should get leave for her ankle injury, and that her personnel records should not be withheld–she appears to have dropped the retaliation argument as she does not brief the evidence supporting it.

Walker asserts that the covenant of good faith and fair dealing is implied in her at-will employment agreement. Walker relies on the Oregon Court of Appeals' conclusion that,

> [T]he parties to an employment at will contract are not subject to the implied duty of good faith and fair dealing insofar as the right to terminate is involved. However, if the parties agree to restrict the right to terminate at will, the duty of good faith and fair dealing applies to the restrictive terms, **as it does to the performance and enforcement of all of the contractual terms** except the right to terminate itself.

Elliott v. Tektronix, 102 Or. App. 388, 396, 796 P.2d 361 (1990) (emphasis added); see also

Sheets v. Knight, 308 Or. 220, 233, 779 P.2d 1000 (1989) (the duty applies to "matters pertaining to ongoing performance of at-will employment agreements"), abrogated on other grounds, McGanty v. Staudenrous, 321 Or. 532, 901 P.2d 841 (1995).

Defendant, however, points to a case from this court explaining Elliott v. Tektronix.

> _____ Elliott . . . merely noted that in at-will employment relationships, if the parties nevertheless contractually agree to restrict rights (such as the right to terminate without cause), the duty of good faith applies to the restrictive terms of their agreement. Because plaintiff here had no reasonable expectation that the provisions of the employee handbook created contractual obligations on the part of defendant, she cannot maintain a claim, premised on contract grounds, for a breach of the duty of good faith and fair dealing.

<u>Spicer v. Cascade Health Servs., Inc.</u>, No. Civ. 03-6377-TC, 2005 WL 2211097, *7 (D. Or. Sept. 9, 2005) (internal citation omitted).  According to defendant, its Handbook explicitly states that it does not create a contract, and no provision in the Handbook is "a promise to you of specific treatment in any specific situation."  August-Sanchez Decl., ¶ 4, Ex. C.  Below, I deal separately with each of plaintiff's allegations that pertain to this claim.

A.      <u>Investigation of her Complaints</u>

Walker contends that defendant did not conduct a good faith investigation into her harassment complaints.  According to Walker, defendant admits it had a policy that it would investigate any discrimination complaint.

Defendant's promise to investigate complaints "as appropriate" appears in its Employee Handbook.  August-Sanchez Decl., Ex. D at 4.  That Handbook, as I note above, specifically states that nothing in it is a "promise of specific treatment," so Walker's claim fails.  Defendant did not have any contractual duty from which the duty of good faith and fair dealing arises.

Furthermore, as I indicate above, Walker fails to raise any material issues of fact about the defendant's violation of any duty to investigate her complaints.  Walker could point to no specific statements or actions of anyone that were discriminatory on the basis of religion.  She simply felt that she was being treated improperly, and suspected that it was due to her religion.  If there is a contractual duty to investigate complaints, Walker raises no issue of material fact that defendant breached any duty of good faith and fair dealing to effectuate that obligation.

B.    Leave for Ankle Injury

Walker argues that in its policies, defendant promised to respond appropriately to questions about family leave under the FMLA.  In practice, however, it employed tactics to reduce the chances that employees would know about or take leave.

Walker does not provide a citation to defendant's policies on leave requests in the record. I could not locate any policies in my independent review of the record.  Any violations of the law are dealt with above, and no duty of good faith arises from any statutory requirement.

C.    Personnel Records

Walker claims she did not receive a copy of her employment records prior to an unemployment benefits hearing in the Summer of 2004, in violation of ORS 652.750, and that defendant now relies on several documents that should have been provided to her in response to her request.

Again, Walker has not pointed to any policy from which a contractual duty arises, such that the duty of good faith and fair dealing could be implicated.  No common law duty of good faith and fair dealing arises from ORS 652.750.

IV.    After-Acquired Evidence

Since I grant defendant's Motion for Summary Judgment for the reasons stated above, I do not reach defendant's after-acquired evidence defense.


///


///

## CONCLUSION

For the foregoing reasons, defendant T-Mobile's Motion for Summary Judgment (#58) is

GRANTED.

IT IS SO ORDERED.

Dated this _____5th_____ day of October, 2007.

_____/s/ Garr M. King_____
Garr M. King
United States District Judge